**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **1:13-cr-075-01-LM** |
| | ) | |
| **JOHN BRYAN VILLEGAS** | ) | |

**GOVERNMENT'S OBJECTION TO THE DEFENDNAT'S MOTION FOR A NON-GUIDELINE SENTENCE, AND SENTENCING MEMORANDUM**

The Government objects to the defendant's Motion for a non-guideline sentence, and submits this sentencing memorandum in support of a guideline sentence, for the upcoming sentencing of John Bryan Villegas, a sexual cyber predator who repeatedly terrorized a young, single mother of a toddler boy in order to force her to create, and then give to him, sexually explicit videos and photographs of herself. Among the many disturbing aspects of Villegas' criminal conduct was the degree of control that he tried to exert over his victim, Jane Doe.[1] He devised specific sexually explicit vignettes and poses and then demanded that Jane Doe video herself acting out those specified scenes and photograph herself in those specified poses. As Jane Doe continually refused Villegas' demands and begged him to leave her alone, Villegas threatened her with even more severe punishment if she did not submit to his demands. In fact, Villegas only stopped tormenting Jane Doe when he was arrested. This criminal conduct is a type of cyberstalking that is growing increasingly more common. It is frequently referred to as "sextortion."

---

[1] Villegas' victim is a person whose identity is known to the government and to the defendant but is identified herein as "Jane Doe." She resided in the District of New Hampshire, which is where she received the e-mail communications. Villegas resided and worked in the District of Maine, from where he sent the e-mail communications.

Villegas' criminal conduct devastated Jane Doe.   At the time, she had no idea who her stalker was.  She eventually learned from law enforcement agents that her stalker was the husband of one of her close friends and son's babysitter.  She had no idea why he had targeted her, how he had found her, or how he knew so much detailed personal information about her, including her name, her son's name, her ex-husband's and boyfriend's names, where she worked, and where she lived.  She feared for her, and for her son's, physical safety and was forced to move out of her apartment.  Jane Doe felt deeply violated, as if her stalker had tried to sexually assault her.  She faced a terrifying Hobson's choice:  create the sexually explicit videos and photographs that Villegas demanded or suffer the promised punishment.  She continues to be thoroughly traumatized by his criminal conduct.

Ultimately, Villegas pleaded guilty to an information charging him with one count of engaging in "cyberstalking,"  in violation of 18 U.S.C. § 2261A.  The seriousness of Villegas' crimes, coupled with the profound need to provide adequate specific deterrence to Villegas, as well as to provide general deterrence to other would-be "sextortionists," dictate the government's recommendation that he be sentenced to 24 months in custody, which is at the low end of his guideline's range.  Moreover, a 24-month sentence would be in line with other sentences meted out in other Courts around the country that involved similar conduct.

## I.        The Defendant's Conduct

On April 7, 2012, the Dover, NH, Police Department responded to a complaint about a burglary that occurred at Jane Doe's residence.  Jane Doe advised that, during that burglary, multiple items were stolen, including several pairs of her underwear and her Apple MacBook Pro laptop.  During subsequent interviews with U.S. Secret Service Special Agent Matthew O'Neill, Jane Doe reported that the stolen laptop contained private photographs of her that were of a

sexual nature.  To her knowledge, the photos had never been transferred to any other person, nor

had they been published or uploaded onto any type of website.  On or about July 10, 2012, the

sextortionate e-mails that form the basis of this case began and all of the photos sent and

received in this case were photos that Jane Doe said had been stored exclusively on her now

stolen laptop.

After being arrested, during an interview with SA O'Neill, and in a statement written by

him, the defendant denied being involved in the burglary and denied stealing Jane Doe's laptop.

Instead, he stated he had hacked into an on-line computer account of Jane Doe and from there

obtained the photographs used for his extortionate demands.  *See* Exhibit #1, redacted copy of

Defendant's post Miranda hand written statement.  That version of events is inconsistent with the

victim's statement that the photographs were never uploaded to the Internet, and is inconsistent

with what the Secret Service was able to learn about Jane Doe's on-line account.  However, for

purposes of the plea in the instant case, how the defendant obtained the photos was legally and

factually irrelevant.  All that mattered was that he admit engaging in conduct that satisfied the

elements of the charged offense, which he did.

However, in a telephone conversation with the Strafford County Attorney today, the

undersigned learned that the defendant has agreed to, and is scheduled to, plead guilty in

Strafford County Superior Court on January 8, 2014, the day after his sentencing here, to

burglarizing the victim's residence and will be sentenced to 12 months committed, to run

concurrently with the sentence in this case.  If, in fact, the defendant committed the burglary

(which he denied to SA O'Neill) he has arguably obstructed justice and may be deserving of an

additional 2 point enhancement, pursuant to USSG §3C1.1.  However, since he has not yet

admitted the burglary, the government is bound by the Plea Agreement to recommend the low

end of the guideline range found by the Court, and it will honor that obligation.  However, the government also has an obligation to bring all relevant and material information to the Court's attention.

As set forth in the Pre-Sentence Investigation Report ("PSI"), Villegas admitted to surreptitiously hacking into Jane Doe's computer account and stealing copies of private, photographic images of Jane Doe that were of a sexual nature.   Regardless of how he obtained them, once armed with those compromising photographs, from July 10, 2012 until he was arrested on July 16, 2012, Villegas engaged in a cyber-terror campaign designed to force Jane Doe to create, and then give to Villegas, sexually explicit videos and photographic images of herself.  He did this by sending a series of anonymous e-mail messages from an e-mail account that he had created and named using Jane Doe's maiden name, appended with the phrase "xoxo" (i.e., "[JANE DOE'S MAIDEN NAME]xoxo@gmail.com," hereinafter referred to as "the 'xoxo' account").   He also opened a linked e-mail account using the name of one of Jane Doe's friend's, presumably in an effort to elude detection in the event law enforcement investigated and cast suspicion on the friend.   In those messages, Villegas told Jane Doe that he had "x-rated" photographs of her, and as proof, he described them and sent her several sample photographs. The photographs he sent were photos Jane Doe had kept private and stored on her laptop computer that had been recently stolen from her home.  Villegas directed Jane Doe to take additional, new videos and photographs of herself engaging in various sexually explicit scenarios and poses that he specified.  He then demanded that she send the videos and photographs to him via e-mail.  When Jane Doe refused, Villegas told Jane Doe that if she did not comply, he would "dox" her, which, as he explained to her, meant that he would "leak" the photographs and personal information about her all over the internet.  He also warned Jane Doe he would send the

photographs throughout Dover, New Hampshire, as well as to her ex-husband, boyfriend, and a recent former employer, which he identified by name.

By way of limited example, on July 11, 2012, Villegas sent Jane Doe an e-mail stating, "I don't mind getting rid of these . . . Not for free though . . . I want to see more of you . . . " and then described various sexually explicit poses and scenarios, including "bonus points . . . if you use toys and actually get off on camera . . . get loud for me . . . close ups as well . . . "

When Jane Doe hesitated and begged Villegas to leave her alone, Villegas threatened to expose her private photographs and personal information.  On July 16, 2012, Jane Doe sent "xoxo" an email stating, in part, "I still don't even understand how you have them to begin with and if they get out it'll ruin my reputation. I'm trying to start a new life and this would absolutely f… everything up I'm trying to accomplish. I don't even know who the hell you are and why you actually have them."  Later, on July 16, 2012, Jane Doe again pleaded with him, "I just don't want these photos getting out. I don't want my info being leaked or anything please I have a family and I can't risk my sons [sic] safety. Please don't."

In response, on July 16, 2012, Villegas replied, in a series of e-mail messages:  "alright [sic] be like that then. see what i do with these . . .  think im [sic] a sick bastard? then im [sic] going to act like one. familiar with doxing? look it up. have fun! . . . i told you. call me a sick bastard Im going to act like one . . . . definition of DOXING leaking Personal information about people on the Internet, often including real name, known aliases, email addresses, general location, pictures . . . [sic]"

On July 16, 2012, at the direction of the Secret Service, the Victim included in an e-mail, "Listen I'm sorry I was nasty earlier I just don't want these photos getting out. I don't want my

info being leaked or anything please I have a family and I can't risk my sons [sic] safety. Please don't", and Villegas replied, "yeah i agree. so i bet now youre [sic] more willing to comply to my request? see we do have a thing going. If you're still willing to do your portfolio. Im [sic] still here to help."

On July 16, 2012, Villegas continued, "Do you think [name of Victim's former employer] would be able to appreciate these artistic shots? Uhm [first and last name of Victim's ex-husband]? Or [first name of Victim's boyfriend]? Would they be able to appreciate these? Im [sic] really looking forward to your reply." He followed up with "That's fine just ignore me I'll send envelopes of pictures to places around Dover, NH and [Jane Doe's former employer]."

To further harass her, on July 17, 2012, Villegas placed sexually explicit photographs of Jane Doe in the U.S. mail, in an envelope that was addressed to Jane Doe.

## II.     The Effects of the Defendant's Conduct on His Victim

Jane Doe was devastated by Villegas' "sextortion" attempts and remains traumatized today.   She had no idea who her stalker was, why he had targeted her, how he had found her, or how he knew so much detailed personal information about her.  Given Villegas' menacing threats and his self-description as a "sick bastard," Jane Doe feared for her and her young son's physical safety and was forced to move out of her apartment until Villegas was finally behind bars.

She faced the very real specter of having private, sexually explicit photographs of herself, as well as her personal information, distributed all over the internet, mailed to locations all over her community, and mailed specifically to her family members, her employer, and her personal

acquaintances.  Thus, Jane Doe not only feared for her and her son's physical wellbeing, but she also feared for her employment, her personal relationships, and her ties to her community.

Jane Doe felt deeply violated, as if her stalker were trying to sexually assault her.  She faced a Hobson's choice, give Villegas the demanded sexually explicit materials or be humiliated by having sexually explicit photographs of herself, along with her personal information, distributed far and wide, for all to see.  To make matters worse, she knew that, even if she ceded to Villegas' demands, that Villegas could still distribute both the stolen and the newly-created sexually explicit materials.

She continues to be thoroughly traumatized by his criminal conduct, as will be detailed at the sentencing hearing.

## III.     The Government Concurs with the PSI's Guideline Calculation

Based on what the government can prove at this point, it believes that the following Guideline calculation applies:

**§2A6.2 – Stalking or Domestic Violence**

| | | |
|---|---|---|
| §2A6.2 | Base offense level | 18 |
| §2A6.2(b)(1)(D) | Pattern involving harassing same victim on multiple occasions | <u>2</u> |
| Total Offense Level | | 20 |
| Acceptance of responsibility adjustment | | <u>-3</u> |
| Adjusted offense level | | 17 |

The government believes that the two-level enhancement is appropriate because Villegas engaged in a "pattern of activity involving stalking, threatening, harassing, or assaulting the same victim."  U.S.S.G. §2A6.2(b)(1)(D).  Villegas sent Jane Doe over a dozen different e-mail messages during the span of several days.  Many of those contained the threats to "dox" her, to send the photographs all over Dover, to notify Jane Doe's ex-husband, employer & boyfriend, and the like.

As part of its plea agreement, the Government has agreed to recommend a sentence at the low-end of the guideline's range which, if the Court accepts the PSI as written, will be 24 months.

**IV.     The 3553 Factors Support a 24-Month Sentence**

**1.     Nature and Circumstances of the Offense**

Villegas' criminal conduct was extremely serious.  Villegas repeatedly reached out, through his computer, to try to force Jane Doe to strip for him.  In essence, Villegas attempted to commit sexual assault by proxy.  Even though Villegas was not physically present in the room when he was coercing her, to Jane Doe, it was precisely the same thing.   The punishment that Villegas threatened was every bit as coercive as if Villegas had threatened to injure her physically.  As Jane Doe was well aware, the widespread distribution of the sexually explicit photos, alongside her name and home address, would not only have humiliated her (not to mention her family), but it could have seriously jeopardized her (and her son's) physical safety. It would not have been unreasonable for the victim to fear that other predators could have shown up at her house had the photos been distributed.

To make matters worse, Villegas took advantage of a woman he knew personally.  He pretended to be a stranger and then taunted Jane Doe by demonstrating that, although ostensibly a stranger, he knew many personal details about her.  He did so presumably to frighten her so that she would in turn cede to his demands.  Villegas also exploited the fact that Jane Doe lived alone with her young son and presumably would feel especially vulnerable.  His conduct was methodical and premeditated.  This was not a one-time slip in judgment.  According to Villegas he first hacked into Jane Doe's computers to steal the photographs of her (or, if in fact he stole the laptop, he burglarized her home), then he set up the e-mail accounts using other people's names, and finally he launched his harassing e-mail campaign.  Villegas engaged in the criminal conduct over the span of many days.  He peppered her with multiple e-mail messages a day, day after day, for almost a week, only stopping when he was arrested.

In addition, Villegas was strikingly callous.  He was unmoved when Jane Doe expressed her concern for her son's safety and her fears that that he would ruin her reputation.  He not only ignored her pleas, but he increased his threats.   He was brazen as well.  He repeatedly used his U.S. Navy-issued computer on the base where he worked, and he used his home computer, where he lived with his wife, who was Jane Doe's close friend and who babysat her son.

The emotional distress he caused to Jane Doe was severe, and will be everlasting.

2.    **Defendant's History and Characteristics**

At the time that Villegas, age 23, embarked on his cyberstalking scheme, he was enlisted in the U.S. Navy.  He was married to Jane Doe's friend, who also babysat Jane Doe's son.  Indeed, he conducted portions of his criminal activity using Navy-issued computers located on the base.  As noted in the PSI at ¶ 36, burglary charges are pending in the Strafford County

Superior Court.  Those charges are directly related to this case and, as noted above, it appears the defendant intends to plead guilty to those charges on January 8, 2014.

   **3.  Just punishment, respect for law, deterrence, and public protection**

   A 24-month sentence appropriately reflects the seriousness of Villegas' criminal conduct and would provide just punishment and promote respect for the law.  Furthermore, a 24-month sentence is needed to deter Villegas, and others like him, from engaging in future criminal activity.  A strong sentence is needed to deter other "sextortionists."  These cyber predators presumably already realize that, because they are hiding behind their computers, it is extremely unlikely that they will be detected.  If, on top of that, they realize that the punishment that is ultimately meted out is fairly mild, then there is a serious risk that these predators will do a "cost-benefit" analysis and continue their crimes unabated.  So a significant prison sentence is needed to deter Villegas and to send a message to other cyberstalkers.  As one District Judge stated in another hacking case:  "[C]ybercrimes by their very nature allow offenders to commit the offenses without leaving their homes and with a veil of anonymity.  This lack of contact with the victims of their crimes and insulation from law enforcement may cause them to be under-deterred.  Only successful prosecution and significant punishment will supply prospective cyber-criminals with the information needed to create real deterrence."  *United States v. Watt*, 707 F.Supp.2d 149, 156-57 (D.Mass. 2010) (citations omitted).

   Moreover, a 24-month sentence is in line with other sentences handed down recently in other, similar "sextortion" prosecutions.   In 2013, in the Central District of California, Keith James Hudson, 38, was sentenced to 24 months for hacking into a poker player's account, stealing naked photographs and then using those photographs to extort the poker player.  In a similar case, Tyler Schrier, 23, was sentenced to 42 months for hacking into a variety of poker

player's accounts to steal naked photographs and other private information to try to extort

money.   In December 2013, in the Central District of California, Karen "Gary" Karzaryan was

sentenced to 60 months for hacking into over 350 women's accounts, obtaining thousands of

nude or semi-nude photographs, and using that information to extort victims to take explicit

photos of themselves.   In 2010, in the Northern District of Iowa, Garret Drew Roegner, 25, was

sentenced to 78 months in prison for attempting to sextort a former girlfriend by threatening to

post sexually explicit photographs of her, including some photos of when she was a minor

engaging in sexual activity with the defendant, on the internet.   Roegner plead guilty to one

count of transporting child pornography (pictures of a 17 year old that he used in his sextortion)

and one count of sextortion.

### 8.      Conclusion

The government asks the Court to deny the defendant's request for a non-guideline

sentence and sentence Villegas as follows:

A)  Impose a 24 month prison sentence;

B)  Impose a 3 year term of supervised release;

C)  Impose a $3,000 fine, in light of the defendant's financial state;

D)  Order restitution for the treatment expenses incurred by the victim as a result of the

defendant's criminal conduct of conviction (that will be provided to the Court by the

Probation Department prior to sentencing) and, if at the time of sentencing the defendant

admits to the burglary, order additional restitution in the amount of $3,040 for the

personal property stolen in the burglary, as noted in the PSI at ¶ 17; and,

E)  Impose a $100 special assessment.

Date:  January 2, 2014

Respectfully submitted,

JOHN P. KACAVAS
United States Attorney

By: /s/ Arnold H. Huftalen
Arnold H. Huftalen
Assistant U.S. Attorney
53 Pleasant St., 4th Floor
Concord, NH 03301
(603) 225-1552
NH Bar #1215
arnold.huftalen@usdoj.gov

/s/ Mona Sedky
Mona Sedky
Senior Trial Attorney
U.S. Dept. of Justice, Crim. Div.
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 353-4304
DC Bar #447968
mona.sedky@usdoj.gov

CERTIFICATE OF SERVICE

I certify that a copy of this Objection and Memorandum, with attached Exhibit #1, has been served upon defense counsel of record, Bjorn Lange, via ECF filing notice this date, January 2, 2014.

/s/ Arnold H. Huftalen
Arnold H. Huftalen